UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| DATA MOUNTAIN SOLUTIONS, INC., *et al.*, ) ) ) ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 08-1623 (PLF) |
| ) | |
| GREGG GIORDANO, *et al.*, ) | |
| ) | |
| Respondents. ) | |

---

OPINION

Petitioners Data Mountain Solutions, Inc. ("DMS"), Frederick S. Hill, Jr., and

Derek McUmber seek confirmation under the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*

("FAA"), of an award issued by arbitrator Michael Kelley on November 14, 2008. In the

alternative, if the Court is not yet prepared to render judgment in this matter, they have moved

for the entry of a preliminary injunction that would, among other things, limit the right of

respondent Gregg Giordano to dissipate his assets. As an alternative form of prejudgment

remedy, the petitioners request preliminary relief under Rule 64 of the Federal Rules of Civil

Procedure, which makes available in a federal court every prejudgment remedy, such as

attachment, garnishment, or sequestration, that is available "under the law of the state where the

court is located" for the purpose of "secur[ing] satisfaction of the potential judgment." FED. R.

CIV. P. 64. For his part, Mr. Giordano — who proceeds on his own behalf without claiming to

speak for Anthony Watson, the other respondent in this matter — has moved to vacate or modify

portions of the arbitration award under Sections 10 and 11 of the FAA.

The Court heard argument on all of the pending motions on January 5, 2010.

Based on those arguments, the parties' written submissions, and the entire record in this case, the

Court will confirm the arbitration award in its entirety, deny the motion to vacate or modify, and

deny the pending motions for preliminary relief as moot.[1]

## I.  BACKGROUND

### A.  The Dispute Leading to Arbitration

DMS is a small, closely held corporation formed under the laws of West Virginia.

Orig. Compl. ¶¶ 3, 9.  It is engaged in the business of electronic data management, id. ¶ 3, and

derives its revenue primarily from its work for another company, NativeTechnologies, Inc.

("NTI"), which has contracted with the United States General Services Administration ("GSA")

to provide technical support for the federal government's email system (the "GSA-NTI contract"

or "dotGOV contract").  Id. ¶ 11.  Under a subcontract with NTI, DMS supplies the technological

---

[1]       The documents reviewed by the Court and cited in this Opinion include the
following: Petition to Confirm Arbitration Award ("Petition"); Mr. Giordano's Motion to Vacate
Partially Award of Arbitrator ("MTV"); petitioners' opposition to the motion to vacate ("MTV
Opp."); Mr. Giordano's reply to the petitioners' opposition ("MTV Reply"); Mr. Giordano's
Supplemental Brief Regarding Motion to Vacate Partially Award of Arbitrator ("MTV Supp.");
petitioners' supplemental memorandum in support of their petition ("Petition Supp."); Mr.
Giordano's supplemental memorandum in opposition to the petition ("Petition Opp. Supp.");
MTV, Ex. 9 ("Final Award"); Petition, Ex. A-1 ("Partial Award"); MTV Supp., Ex. 1
("Statement of Claim"); MTV Supp., Ex. 2 ("Answering Statement"); MTV Supp., Ex. 4
(Transcript of Arbitration Proceeding ( Feb. 27, 2008)) ("Arb. Trans"); Petition Supp., Ex. D
(Claimants' Pre-Arbitration Brief) ("Cls.' Pre-Arb. Br."); Petition Supp., Ex. E (Respondents'
Pre-Arbitration Brief) ("Resps.' Pre-Arb. Br.");Transcript of Hearing (Jan. 5, 2010) ("Oral Arg.
Trans."); Data Mountain Solutions, Inc. v. Giordano, Civil Action No. 06-1666, Complaint
(D.D.C. Sept. 28, 2006) ("Orig. Compl."); Orig. Compl., Ex. 2 ("Shareholders Agreement");
Motion to Dismiss or, in the Alternative, to Stay, Civil Action No. 06-1666 (D.D.C. Oct. 23,
2006) ("2006 MTD"); plaintiffs' opposition to the motion to dismiss ("2006 MTD Opp.");
defendants' reply to plaintiffs' opposition ("2006 MTD Reply"); and Civil Action No. 06-1666,
Transcript of Hearing (D.D.C. May 18, 2007) ("2007 Trans.").

products and services required by the GSA in exchange for ninety-five percent of the GSA-NTI

contract fees.  See Cls.' Pre-Arb. Br. at 2 (NTI receives only five percent of GSA-NTI contract

proceeds); Resps.' Pre-Arb. Br. at 2 (same).

On June 2, 2003, under a separate contract ("the Shareholders Agreement"), Mr.

Hill, Mr. McUmber, Mr. Giordano, and Mr. Watson were named as the initial shareholders of

DMS.  See Shareholders Agreement at 15.  Each held a one-quarter ownership interest in the

company, id. ¶ 12, and was prohibited from selling or otherwise transferring his shares without

the written consent of the other three shareholders.  Id. ¶ 3(a).  Each shareholder promised to vote

his shares in favor of the election of all four men to DMS' board of directors; each also promised

that he would "continue to serve as a director so long as he retains an ownership interest . . . in

the Corporation."  Id. ¶ 1(a).  If any of the four transferred his entire ownership interest to

someone else, he would "resign from all positions . . . as an officer and/or director" of DMS at

that time.  Id. ¶ 1(b).  The Agreement also included the following provision:

> 10.   Arbitration and Specific Performance
>
> (a)   Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, may, at the option of any party thereto, be resolved by arbitration by a panel of three (3) arbitrators in accordance with the Rules of the American Arbitration Association then prevailing, and such arbitration shall be held in _____ or other place mutually agreeable to the parties.  The decision of such panel shall be enforceable in any court having jurisdiction.  The panel can enter an ex parte order if a Shareholder fails or refuses to participate in the arbitration proceeding.
>
> (b)   Subject to the foregoing, inasmuch as the shares are closely held and the market for them is limited,

> irreparable damage would result if this Agreement
> is not specifically enforced.  The parties hereto
> agree that their respective rights and obligations
> shall be enforceable in a court of equity by a decree
> of specific performance and that appropriate
> injunctive relief may be applied for and granted in
> connection therewith.  Such remedies shall,
> however, be cumulative and not exclusive and shall
> be in addition to any other remedies which any party
> may have hereunder or otherwise.

Shareholders Agreement ¶ 10.

In September 2006, Mr. McUmber, Mr. Hill, and DMS brought suit in this Court against Mr. Giordano, Mr. Watson, and a third defendant not relevant here.  Among many other things, Mr. McUmber and Mr. Hill claimed that Mr. Giordano had violated the Shareholders Agreement by buying all but one of Mr. Watson's DMS shares without the consent of Mr. McUmber or Mr. Hill.  Orig. Compl. ¶ 14.  To pay for those shares, Mr. Giordano allegedly withdrew $60,000 from DMS' corporate accounts and gave some of that money to Mr. Watson.  Id. ¶¶ 13-14.  He also gave Mr. Watson DMS proprietary technology called "SecuriCabinet"  "as purported additional consideration for [Mr. Watson's] relinquishment of his roles and entitlements as a shareholder, director, and officer of DMS."  Id. ¶ 14.

Mr. McUmber and Mr. Hill contended that Mr. Watson's sale of his stock to Mr. Giordano was void in light of the Shareholders Agreement.  Orig. Compl. ¶¶ 14, 16-17.  They also asserted that Mr. Watson had, with the permission of all other shareholders, sold his 22,500 shares of DMS stock back to the company, not to Mr. Giordano, in exchange for the rights to SecuriCabinet and $28,406.  Id. ¶ 14.

4

In addition to this dispute over the disposition of Mr. Watson's shares, there was a disagreement about Mr. Hill's ownership position in the company. According to the plaintiffs, at some point Mr. Hill had "offered to relinquish approximately [two-thirds] of his stock to the corporation in exchange for $32,000, the book value of his stock" at the time. Orig. Compl. ¶ 15 n.2. DMS' corporate counsel, however, claimed that no record of the transaction existed. Id. As a result, the plaintiffs professed to be uncertain of how many shares of DMS stock Mr. Hill owned as of the filing of their original complaint. Id.

The plaintiffs further alleged that Mr. Giordano had used his authority as the self-proclaimed majority shareholder of DMS to divert to himself payments from the GSA-NTI contract that should have been made to Mr. McUmber, Mr. Hill, and/or DMS itself. Orig. Compl. ¶ 42; see also id. ¶ 21. They estimated that the payments under the contract that were wrongfully intercepted and retained by Mr. Giordano amounted to approximately $500,000. Id. ¶ 97; see also id. ¶¶ 44, 74. For this and other harms that allegedly resulted from the defendants' improper corporate transactions, the plaintiffs demanded "at least" $680,607 in compensatory damages, one million dollars in punitive damages per defendant, id. ¶¶ 74, 97, disgorgement of the proceeds of the GSA-NTI contract, id. ¶ 53, specific performance, id. ¶ 61, and declaratory and injunctive relief that would establish, among other things, the entitlement of the plaintiffs "to any and all NTI/GSA-related contract documents[] and proceeds, checks and other payments due any of the Plaintiffs thereon, that are being retained or withheld by any of the Defendants." Id. ¶ 109(D).

In response to the plaintiffs' complaint, the defendants filed a motion to dismiss or to stay in which they asserted that "every single count of the 45-page Complaint relates to the

Shareholde[rs] Agreement, . . . a valid and binding contract containing an arbitration clause.

Giordano has invoked that clause, and the plaintiffs must arbitrate their claims." MTD at 8. The

Court agreed, and ordered the case stayed while "the parties . . . submit their claims to arbitration

pursuant to Paragraph 10(a) of the Shareholders Agreement." Data Mountain Solutions, Inc. v.

Giordano, Civil Action No. 06-1666, Memorandum Opinion and Order at 5 (D.D.C. Nov. 21,

2006).

  Several months later, after the parties had still not proceeded to arbitration, the

Court held a status hearing and inquired about the source of the delay. The plaintiffs explained

that they were hesitating in part because they were not sure that all of their claims fell within the

scope of the Shareholders Agreement's arbitration clause: "[O]ur fear is that we will get to

arbitration and Mr. Giordano will say, . . . I'm only arbitrating those issues that are directly

related to the Shareholders' Agreement, and then we're stuck, because we have a stay, we can't

proceed to get a remedy for the loss of funds that has occurred since June of 2006." May 18,

2007 Trans. at 4-5. The plaintiffs specifically questioned whether the distribution of proceeds

from the GSA-NTI contract was arbitrable. Id. at 3; see also id. at 5. The Court responded that it

had ordered the plaintiffs to resolve all of their claims in arbitration, id. at 5, and noted that if any

of the parties believed that any of those claims were not arbitrable, they should register that

objection immediately. Id. at 10-11. Defendants' counsel raised no objections to the Court's

order, merely saying, "I also agree with Your Honor that Your Honor ruled that all these claims

are going to be arbitrated, and that was the clear direction of the order. So I don't disagree with

you at all." Id. at 10.   Ultimately, no party filed a motion to amend the Court's order mandating

arbitration of all issues, and the parties proceeded to arbitration.[2]

## B.  Arbitration Proceedings

In their Statement of Claim before the arbitrator, the plaintiffs/petitioners (called

"claimants" during the arbitration) recited the same facts that they included in the complaint filed

with the Court.  They alleged that Mr. Giordano had used corporate funds to make an invalid

purchase of Mr. Watson's stock, Statement of Claim ¶¶ 11-12, and that Mr. Watson also wrongly

claimed that he received SecuriCabinet from Mr. Giordano in exchange for his "relinquishment

of his roles and entitlements as a shareholder, director, and officer of DMS."  Id. ¶ 12.  They

repeated their claim that Mr. Watson had agreed to sell his shares to DMS, not to Mr. Giordano,

and that the sale had been approved by all shareholders in conformity with the Shareholders

Agreement.  Id.  And they once again asserted that "Giordano has intercepted, and now holds,

substantial payments from DMS's client, NTI, that are intended for, and payable to, Claimants

DMS and McUmber."  Id. ¶ 19.  They claimed that they had sustained approximately $500,000 in

damages as a result of this diversion of payments from NTI, id. ¶ 32, and requested that Mr.

Giordano be required to "disgorge . . . to the Claimants . . . any and all contract proceeds, checks

and other payments due the Claimants but that are being wrongfully retained or withheld by the

Respondents," id. at 13, including "all proceeds of DMS' subcontract with NTI, excepting those

payments due and payable to Giordano consistent with agreements and practices in place as of

---

[2]     The Court dismissed Civil Action No. 06-1666 after a year had passed with no
indication that the parties intended to continue litigating the case.  See Data Mountain Solutions,
Inc. v. Giordano, Civil Action No. 06-1666,  Minute Order (D.D.C. July 8, 2008).

June, 2006." Id. at 14-15.  Furthermore, the Claimants requested "rescission of any DMS stock issuances or transfers to Mr. Giordano above the equal 'ownership proportion' to which he committed and agreed under the Shareholders' Agreement." Id. at 16.

   In their response to the Statement of Claim, the defendants/respondents denied that Mr. Watson had sold any stock back to DMS, admitted that the attempted sale of Mr. Watson's stock to Mr. Giordano was void, and insisted that Mr. Hill had sold most of his stock back to the company.  Answering Statement at 2-3.  They raised no objection to the arbitrability of any of the claims contained in the Statement of Claim.

   In their pre-arbitration brief, the claimaints asked for binding declarations by the arbitrator to the effect that (1) Mr. Watson no longer had any ownership interest in DMS, Pre-Arb. Brief at 1; (2) Mr. Hill owned 19,000 shares in DMS, id. at 1-2; and (3) Mr. McUmber and Mr. Giordano were each entitled to 23 percent of the proceeds paid to NTI by the GSA, with DMS receiving 49 percent and NTI the remaining 5 percent.  Id. at 2.  They further requested that Mr. Giordano pay to Mr. McUmber any revenue under the NTI contract that was still owed to him (McUmber).  Id. at 3.

   The respondents, in their responsive pre-arbitration brief, made no objections to the arbitrability of any of the claims raised by Mr. McUmber and Mr. Hill.  They instead maintained that (1) Mr. Hill had sold approximately 16,000 shares of his DMS stock back to the company, Resps.' Pre-Arb. Br. at 2; (2) Mr. Watson had never sold any of his own stock to DMS, id. at 6; and (3) pursuant to a contract called the "Teaming Agreement" signed by Mr. Giordano, DMS, and NTI in January of 2003, Mr. Giordano was entitled to 47.5 percent of all GSA-NTI contract proceeds, DMS to another 47.5 percent, NTI to 5 percent, and Mr. McUmber to none.

Id. at 1-2.  They too sought relief from the arbitrator, seeking, among other things, "a declaration

of the correct ownership percentages of DMS," "an accounting of all DMS funds expended by

Hill and McUmber since May 25, 2006," and "the return to DMS of all monies and expenditures

by Hill and McUmber not authorized by the Board of Directors, including salary, bonuses and

expenses."  Id. at 7-8.

On November 15, 2007, the arbitrator sent to the parties an email message in

which he stated:

> There is a . . . set of issues and relief requested that I indicated to
> the parties I do not believe is in the scope of the arbitration clause
> in the Shareholders Agreement for Data Mountain Solutions, e.g.
> issues that might require me to determine individual entitlements
> under contracts with third parties.  I informed the parties that I
> would be pleased to consider these issues pursuant to a submission
> agreement.

MTV, Ex. 3.  In response, the claimants indicated that they were "willing to submit all of their

disputes with Mr. Giordano (and Mr. Watson) to the arbitrator for a decision."  MTV, Ex. 4.  The

respondents raised only one objection: they asserted that certain claims included in the plaintiffs'

complaint before this Court were not contained in the Statement of Claim.  According to Mr.

Giordano and Mr. Watson, the supposedly omitted claims had been "waived."  MTV, Ex. 5 at 1.

They went on to say:

> Our view is that such additional counts and relief sought were
> arbitrable, and are subject to the arbitration clause; our only
> objection to their being heard at this late date is the failure to file
> them in arbitration as ordered by the Court. . . . Should you rule
> that such claims have not been waived and may be raised at this
> late juncture, we would obviously have no objection to their being
> arbitrated: indeed, Judge Friedman's order required them to be
> arbitrated.

Id.

9

After hearing the parties' initial arguments, the arbitrator issued what he called a "partial award" on December 4, 2007.  He declared, among other things, that Hill, Watson, McUmber, and Giordano each owned 22,500 shares of DMS stock, Partial Award ¶ 2, and that various other individuals and entities ("third-party shareholders") owned a total of 1,234 additional shares.  Id.  He further declared that Hill, Watson, McUmber, and Giordano still constituted the company's board of directors, with Mr. Hill as chairman.  Id. ¶ 3.  The arbitrator prohibited any shareholder from transferring any DMS shares or attempting to change the composition of the board of directors before the issuance of the arbitrator's final award.  Id. ¶¶ 2-3.  Because DMS' third-party shareholders routinely voted with Mr. Giordano and Mr. Watson, this initial ruling by the arbitrator left the respondents in control of the company.  See MTV at 13.  At the conclusion of the Partial Award, the arbitrator noted that the proceedings before him had not yet concluded, explaining that  "[a]ny other relief sought by the parties" would be "determined in the Final Award of this matter."  Id. ¶ 7.

On January 8, 2008, the arbitrator issued an "interim order" in which he declared that, from the date of his order until the conclusion of the arbitration, "Claimant McUmber shall be entitled to receive from DMS . . . $10,000 monthly dating back to September 2007 for services rendered by him on the dotGOV contract," plus payment at a specified hourly rate for work on another contract.  Interim Order ¶ 2(a).  The arbitrator also ordered the company to compensate a woman named Susan Hunt for services performed on something called the "BCBSNC contract."  Id. ¶ 2(b).

At around this point in the arbitration proceedings Mr. Giordano began complaining that certain issues were not "appropriate for this arbitration."  MTV, Ex. 6 at 1.  It is

10

not clear, however, which specific claims struck him as not "appropriate."  In a letter dated

February 19, 2008, respondents' counsel stated that the respondents "do not believe claims to

employees' compensation, or strategic decisions of the company, are suitable for arbitration, and

do not wish them to be referred to an arbitrator."  MTV, Ex. 7 at 1.  In particular, the respondents

objected to the arbitration of such issues as "the proper rate of payment for a contractor working

in North Carolina, or whether Ms. Hunt is the appropriate person for a particular job, or what

contracts DMS should pursue or decline."  Id.  They raised similar complaints in subsequent

emails, stating that "[w]e continue to believe that awards of compensation, decisions regarding

the hiring or firing of employees, decisions regarding the direction of the company, and other

routine business dealings are the sole province of the directors and shareholders of Data

Mountain Solutions, and the arbitration clause of the Shareholders' Agreement cannot be read to

defer these business decisions to an arbitrator."  MTV, Ex. 8 at 1; see also MTV, Ex. 9 at 1

(same).

   At a hearing before the arbitrator held on February 27, 2008, counsel for the

respondents again complained that there were a "number of issues that simply have no real place

in arbitration that are being raised either directly or indirectly in here, which have to do with

really decisions that belong to the strategic direction of the company or decisions that the

shareholders want to make about the direction of the company."  Arb. Trans. at 11.  He suggested

that the arbitrator should order the parties to convene a shareholders' meeting to resolve those

issues.  Id.  Again, however, counsel was unclear about exactly which issues he considered to

"have no real place in arbitration," referring vaguely to "decisions of compensation or strategic

direction or which contracts to pursue."  Id. at 14.

After reviewing additional evidence and argument submitted by the parties, the arbitrator apparently began to believe that his initial findings as to the number of DMS shares held by each of the parties were incorrect.  At the February 27, 2008 hearing, respondents' counsel asked the arbitrator about "possible outcomes . . . of the next phase" of arbitration, wondering whether future decisions would address "potential shareholdings . . . of everybody[.] I know you have already ruled on that.  Are you considering that for redecision again or where is that?"  Arb. Trans. at 41.  The arbitrator confirmed that he was in fact considering revisiting the issue of the respective share holdings of the parties and adjusting the number of shares attributed to each of the claimants and respondents based on the evidence presented to him:

> I think I issued a . .. preliminary award or partial award based on some understandings of the facts and the claims involving the shareholding.
>
> . . . . I have heard a couple of things in the last few days which have caused me to maybe rethink a couple of things here. . . . I would be loathe to make a change to the partial award.  But if some new facts and circumstances on claims are raised which might need [sic] me to revisit that, I would probably do it in the context of what would be then the final award.

Id. at 41-42.

On September 19, 2008, the arbitrator issued his ultimate award, which was subsequently modified on November 14, 2008, to correct a computational error.  The Court refers to that award, as modified, as the "Final Award" in this matter.  As part of that award, the arbitrator ordered two stock transactions: First, Mr. Watson was ordered to sell to DMS the 22,500 shares attributed to him by the Partial Award.  Final Award ¶ 3(a).  The purchase price would consist of "the US[ ]$55,000 received by Watson from DMS funds paid directly or

indirectly via Giordano on or about May 24, 2006, plus accrued interest thereon," plus "the transfer of 100% of the shares owned by DMS in SecuriCabinet, which transfer occurred no later than fiscal year 2005."  Id.  Second, Mr. Hill was ordered to sell to DMS 15,006 of his 22,500 Partial Award shares.  Id. ¶ 3(b).  His consideration consisted of "the US[ ]$32,000 already received by Hill from DMS since approximately May 1, 2004," plus "a payment to be received from DMS in the amount of $9,813.15, which payment shall be made by DMS no later than ten (10) business days from the date hereof."  Id.  Those stock transactions left Mr. Hill with 7,494 shares, Mr. Giordano with 22,500, Mr. McUmber with 22,500, Mr. Watson with zero, and various nonparties with a total of 1,234.  Final Award ¶ 3(b).  With those share positions, Mr. McUmber and Mr. Hill, assuming they acted together, could command a majority of votes at any shareholder meeting.

The arbitrator declared that DMS' board of directors consisted of Mr. Giordano, Mr. Hill, and Mr. McUmber, with Mr. Hill serving as the chairman.  Final Award ¶ 4.  He further found that, "unless and until such individuals resign, are removed or are replaced in accordance with the Shareholders Agreement and Bylaws," Mr. Hill was DMS' president and treasurer, Mr. McUmber its vice-president, and Mr. Giordano its secretary.  Id. ¶ 5.  "All tangible and intangible property and assets of DMS" were to be placed "under the control of Hill, in his capacity as President of DMS, within ten (10) business days of the date hereof."  Id. ¶ 6.

Finally, in Paragraph 9 of the Final Award, the arbitrator determined the manner in which payments from the GSA-NTI contract were to be divided among the parties:

> The Arbitrator does not have jurisdiction over either the General
> Services Administration's . . . agreements with [NTI] or NTI's
> Teaming Agreement with DMS . . . .   However, the Arbitrator

13

> finds that a contract exists among DMS, Giordano, and McUmber
> as to the (a) services to be performed by each to NTI and to GSA
> for the purpose of fulfilling NTI's contractual obligations to GSA
> and (b) division of fees among them and NTI arising from the
> GSA-NTI contract (the "GSA-NTI Fee Sharing Agreement").
> Evidence of this GSA-NTI Fee Sharing Agreement dates back to at
> least May 2004 and such GSA-NTI Fee Sharing Agreement
> remains a valid agreement among DMS, Giordano and McUmber
> as of the date hereof.

Final Award ¶ 9.

As Paragraph 9 of the Final Award makes clear, the arbitrator rejected Mr. Giordano's arguments that the Teaming Agreement controlled the manner in which GSA-NTI contract fees were to be divided among Mr. Giordano, Mr. McUmber, and DMS itself. Instead, the arbitrator found that Mr. Giordano, Mr. McUmber, and DMS had agreed among themselves no later than May 2004 that DMS would be entitled to 49 percent of the proceeds from the GSA-NTI contract, Mr. Giordano to 23 percent, and Mr. McUmber to 23 percent. Final Award ¶ 9. The arbitrator then found "that DMS and McUmber have not received the full amounts due to them under the GSA-NTI Fee Sharing Agreement, while Giordano has been overpaid." Id. Consequently, Mr. Giordano was ordered to pay $166,957.19 to DMS and $120,083.00 to Mr. McUmber within thirty days of the date of the Final Award. Id. If Mr. Giordano was unable to make those payments within thirty days, all future proceeds from the GSA-NTI contract, aside from the five percent reserved for NTI under the terms of the Teaming Agreement, were to be apportioned between DMS and Mr. McUmber until Mr. Giordano's debt to them was repaid. Id.

*C.  Subsequent History*

On September 22, 2008, DMS, Mr. McUmber, and Mr. Hill filed the instant

lawsuit in this Court to confirm the final arbitration award.  Mr. Giordano and Mr. Watson

opposed the petition to confirm and, after the modified final award was issued, filed a motion to

partially vacate or modify the award.  For reasons explained in an Opinion issued on August 20,

2009, the Court denied both the application to confirm the award and the motion to vacate without

prejudice.  See Data Mountain Solutions, Inc. v. Giordano, Civil Action No. 08-1623, Opinion

and Order at 8-11 (D.D.C. Aug. 20, 2009).  At the Court's direction, the parties filed several

supplemental memoranda; the Court construed them as renewed motions to confirm or vacate the

award.  See id., Minute Order (D.D.C. Dec. 29, 2009).  On December 22, 2009, the petitioners

filed the pending motions for preliminary relief.

## II.  DISCUSSION

The Federal Arbitration Act ("FAA") provides that a "written provision in . . . a

contract evidencing a transaction involving commerce to settle by arbitration a controversy

thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and

enforceable, save upon any grounds as exist at law or in equity for the revocation of any contract."

9 U.S.C. § 2.  The FAA applies to any transaction involving interstate commerce and creates a

strong presumption in favor of the enforcement of agreements to arbitrate; any doubts regarding

the scope of an agreement to arbitrate are to be resolved in favor of arbitration.  See

Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226-27 (1987) (with enactment of

the FAA Congress mandated that arbitration agreements be rigorously enforced); see also Moses

H. Cone Memorial Hospital v. Mercury Construction Corporation, 460 U.S. 1, 24-25 (1983);

Finegold, Alexander & Assocs. v. Setty & Assocs., 81 F.3d 206, 207-08 (D.C. Cir. 1996).  The

Supreme Court has stressed that "the liberal federal policy favoring arbitration agreements,

manifested by this provision and the Act as a whole, is at bottom a policy guaranteeing the

enforcement of private contractual arrangements."  Mitsubishi Motors Corp. v. Soler

Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985).

        The FAA provides that an arbitration award may be vacated "where the arbitrators

exceeded their powers."  9 U.S.C. § 10(a)(4).  The party challenging the award bears the burden of

demonstrating that a circumstance justifying vacatur exists.  See Kurke v. Oscar Gruss & Son,

Inc., 454 F.3d 350, 356 (D.C. Cir. 2006); Al-Harbi v. Citibank, N.A., 85 F.3d 680, 683 (D.C. Cir.

1996).  Here, Mr. Giordano argues for the vacatur of three portions of the Final Award.  First, he

argues that the arbitrator lacked the authority to order Mr. Watson to sell his 22,500 shares of

DMS stock back to the company.  MTV at 11.  Second, he maintains that the arbitrator exceeded

his authority by "appointing" the directors and officers of DMS in the Final Award.  Id. at 8.

Third, he claims that any dispute between the parties regarding the proper division of fees from

the GSA-NTI contract (the fee-splitting dispute) is not arbitrable because it is not encompassed by

the arbitration clause of the Shareholders Agreement.  Id. at 14.  Thus, according to Mr. Giordano,

the arbitrator lacked jurisdiction to decide the issues discussed in Paragraph 9 of the Final Award,

which determines the proportions in which the GSA-NTI contract fees are to be divided among

Mr. Giordano, Mr. McUmber, and DMS.  Id.[3]

---

[3]        Mr. Giordano also argues that Paragraph 9 of the Final Award should be modified
— exactly how, he does not say —  under 9 U.S.C. § 11, which provides that a court may modify
or correct an award "[w]here the arbitrators have awarded upon a matter not submitted to them."

The Court examines Mr. Giordano's arguments for the vacatur of various portions of the Final Award below and explains why each lacks merit.

## A. Order That Mr. Watson Sell His Shares

Mr. Giordano contends that the ordered "sale" of Mr. Watson's stock to DMS in exchange for (1) $55,000 in DMS funds previously paid to Mr. Watson in May 2006 and (2) ownership of SecuriCabinet, conveyed to Mr. Watson in 2005 or 2006, should be vacated because the arbitrator lacked the authority to provide such a remedy.  MTV at 11.  Mr. Giordano makes two arguments in support of this contention.  First, he asserts that "there is nothing to suggest that 'any authority of competent jurisdiction' could simply divest a private citizen of his right to own the shares of a corporation engaged in a lawful enterprise. . . . Nothing in the Modified Final Award even remotely suggests a basis for later stripping Watson of his lawful ownership against his apparent will."  MTV at 12.  Second, he argues that "[t]here is simply no basis under the [Shareholders] Agreement or West Virginia law to order DMS to acquire Watson's stock."  Id.

The evidence before the arbitrator contained numerous allegations supporting the proposition that Mr. Watson was no longer the rightful holder of the 22,500 shares of stock he was ordered to relinquish.  The claimants asserted that he had agreed to sell those shares back to the company and had already accepted consideration for them.  Statement of Claim ¶ 12.  After

---

MTV at 1.  Mr. Giordano, however, does not contend that the fee-splitting dispute was not submitted to the arbitrator.  Instead, he protests that he did not *consent* to the submission of the issue, see id. — an argument that amounts to an assertion that the arbitrator exceeded his powers by ruling on an unarbitrable claim.  See infra at 23.  This is the same argument made by Mr. Giordano in favor of vacating the Final Award under Section 10 of the FAA and so does not merit separate discussion.

the arbitrator found, in the Partial Award, that Mr. Watson still held those 22,500 shares, the claimants argued that he should either give up the shares or the consideration he had received for them.  MTV, Ex. 6 at 2.  Either claim, if found meritorious by the arbitrator, would justify the remedy granted in the Final Award.  Mr. Giordano's claim that Mr. Watson was "stripp[ed] . . . of his lawful ownership against his will" for no reason at all, MTVat 12, is simply not true.  The evidence presented to the arbitrator led him to conclude that the company had already paid for Mr. Watson's stock with the $55,000 of company funds Mr. Giordano gave Mr. Watson in May 2006, plus the right to SecuriCabinet conveyed to Mr. Watson in 2005.  See Final Award ¶ 3(a).  Thus, Mr. Watson was no longer the rightful holder of those shares.  Under the FAA, the Court is not free to substitute its own factual findings or conclusions for those of the arbitrator.  See Kurke v. Oscar Gruss & Son, Inc., 454 F.3d at 355 (arbitration award must be confirmed if any "justifiable ground for the decision can be inferred from the facts of the case" (citation and internal quotation marks omitted)).

Nor does the Shareholders Agreement forbid the sale of Mr. Watson's shares as ordered by the arbitrator; on the contrary, such a transfer is explicitly contemplated by the Agreement.  As the arbitrator noted, see Final Award ¶ 3, Paragraph 3(c) of the Agreement refers to the possibility that "any authority of competent jurisdiction" could potentially "order[] the sale, assignment, or other transfer of all or any portion of the shares" of DMS outstanding, even if the ordered sale did not comply with the restrictions laid out in the Agreement.  Because the Agreement's arbitration clause places arbitrators within the category of "authorit[ies] of competent jurisdiction," it is clear from Paragraph 3(c) that an arbitrator has the power to order a party to the Agreement to sell his shares.

18

Paragraph 3(c) of the Shareholders Agreement goes on to provide that, if a sale of shares is ordered, "the Corporation or its designee shall have the option, but shall not be required, to purchase all or any of the shares owned or transferred by the subject Shareholder." Mr. Giordano reads this provision to mean that an arbitrator cannot order the company to buy Mr. Watson's stock. See MTV at 13. He is wrong. Paragraph 3 of the Shareholders Agreement refers to orders that could be issued by "any authority of competent jurisdiction," which presumably includes courts as well as arbitrators. It is not within the power of DMS' shareholders to prohibit courts from ordering the company to buy back shares of its own stock. Paragraph 3 therefore cannot mean, as Mr. Giordano would like, that DMS can never be ordered to buy its own stock. Instead, the provision is more plausibly read to mean that if a shareholder is ordered to dispose of his stock, but is not required to convey it to anyone in particular, DMS has the first option — but not any obligation under the contract — to buy that stock from him.

This reading is more consistent than Mr. Giordano's with the arbitration clause of the Shareholders Agreement. That clause is a broad one that places no limits on the authority of the arbitrator and, in fact, explicitly contemplates that orders of specific performance or injunctive relief may be necessary to effectuate the purposes of the Agreement. See SA ¶ 10(b). Given that the entire Agreement is concerned with the conditions under which shares may or must be transferred, see SA ¶ 4 (describing circumstances under which shares must be placed for sale), it strains credulity to assert, as Mr. Giordano does, that an arbitrator authorized to order specific performance or injunctive relief would be powerless to order the sale or purchase of shares.

The only legal authority Mr. Giordano cites to support his argument is Davis v. Chevy Chase Financial Ltd., 667 F.2d 160 (D.C. Cir. 1981). That case is inapposite. There, the

19

relevant arbitration clause provided for arbitration in the event that the corporation in question and one of its shareholders could not agree on "[t]he fair market value of" shares to be sold back to the company.  Id. at 165.  The findings of the arbitrator were to be binding "as to the fair market value of the offered Shares."  Id.  Understandably finding that the clause authorized the arbitrator only to make determinations as to the value of the shares, the court of appeals ruled that the arbitrator did not have the authority to consider whether the shareholder was required to sell any shares back to the company.  Id. at 167.  Because the arbitration clause at issue in that case is so different from the one involved here, Davis does not control, or even inform, the outcome of this case.

In the face of a broad arbitration clause placing no limits on the remedial authority of the arbitrator, Mr. Giordano has offered only strained readings of the Shareholders Agreement and inapposite case law.  He has not met his burden of demonstrating that the arbitrator lacked the authority to order the return to DMS of Mr. Watson's stock.

### B.  The "Appointment" of DMS' Directors and Officers

Mr. Giordano claims that by identifying the existing directors and officers of DMS in both the Partial and Final Awards, the arbitrator impermissibly "interfered directly in the internal management of DMS."  MTV at 6.  According to Mr. Giordano, once the arbitrator had stated in the Partial Award that Mr. Giordano, Mr. Hill, Mr. McUmber, and Mr. Watson each owned 22,500 shares of DMS stock, he should have refrained from making any attempt to define the company's existing governance structure and left it to the feuding shareholders to choose their directors and officers at some future shareholder meeting to be held on an unspecified date.  See id. at 9-10.  That the arbitrator should have so limited himself is supposedly evident from two

20

West Virginia court cases, one decided in 2001 and the other in 1913.  See id.  Mr. Giordano

argues that these two cases stand for the proposition that "absent fraud or conduct amounting to

fraud, the majority of the shareholders of a solvent corporation 'have the uncontrollable right to

manage the corporate affairs' without interference by a court of equity.'"  Id. (citing State ex rel.

Smith . Evans, 209 W. Va. 340, 344 (2001)).  The arbitrator's "appointment" of DMS' directors

and officers allegedly violates this principle.

       For many reasons, this argument is without merit.  First, the arbitrator did not

"appoint" any directors or officers of DMS in either his Partial Award or his Final Award.  He

merely identified the individuals that remained as directors and officers of the corporation once he

had determined the correct share positions held by Mr. Giordano, Mr. Hill, Mr. McUmber, and

Mr. Watson — that is, after determining that Watson had already sold his shares to DMS and had

been compensated, and that Hill had agreed to sell some of his shares.  Mr. Giordano himself

admitted that, going into the arbitration process, the directors of DMS were Mr. Giordano himself,

Mr. Hill, Mr. McUmber, and Mr. Watson.  See Answering Statement at 2.  Indeed, the

Shareholders Agreement itself states that those individuals are the directors of the company, and

are to remain so as long as each "retains an ownership interest . . . in the Corporation."

Shareholders Agreement ¶ 1(a).  The arbitrator modified the identities of the company's directors

only by ruling, in his Final Award, that Mr. Watson no longer was one.  That ruling followed as a

necessary consequence of Mr. Watson's share position.  As of the date of the arbitrator's Final

Award, Mr. Watson no longer owned shares in the company.  Under the explicit terms of the

Shareholders Agreement, he therefore could no longer serve as either a DMS director or officer.

See Shareolders Agreement ¶ 1(b).

Similarly, the arbitrator made no invasive rulings regarding the identities of DMS'

officers.  He stated in the Final Award that Mr. Hill is DMS' president and treasurer, Mr.

Giordano its secretary, and Mr. McUmber its vice president.  Mr. Giordano himself acknowledged

at the outset of arbitration that Mr. Hill was the company's president and treasurer and Mr.

Giordano its secretary.  See Answering Statement at 2.  He has not argued that Mr. McUmber was

other than the vice president of DMS (although Mr. McUmber has previously represented that he

is the company's CEO, see Statement of Claim ¶ 2).

Even if the arbitrator had reversed some decision of Mr. Giordano and Mr.Watson

regarding the identity of the company's officers — and again, there is no evidence of this, nor has

Mr. Giordano even alleged it — he would have been well within his authority to do so.  The

dispute between Mr. Watson and Mr. Giordano, on the one hand, and Mr. Hill and Mr. McUmber,

on the other, is more than anything else about who controls the company.  See Petition Supp., Ex.

E (Respondents' Pre-Arbitration Brief) at 1. Mr. Giordano and Mr. Watson have claimed that they

do.  See id.  The arbitrator disagreed.  See Final Award ¶ 3(b).  Any purported changes in the

identity of the company's officers made by Mr. Giordano and Mr. Watson would be void as a

necessary consequence of the arbitrator's ruling.

The West Virginia cases cited by Mr. Giordano say nothing that undermines any of

this reasoning.  They merely establish that a court may not, absent evidence of fraud or similar

misconduct, reverse a valid decision by a company's majority shareholder(s) to name a particular

individual to a position as an officer of the company, or to remove an individual from such a

position.  See Smith v. Evans, 209 W.Va. at 282; Smiley v. New River Co., 77 S.E. 970, 977-78

(W.Va. 1913).  There is no allegation here that the arbitrator has reversed any such decision.

Finally, the arbitrator did not deprive DMS' legitimate shareholders of the right to exercise any power held by them.  Although he identified the officers and directors of the company as of the date of the Final Award, the arbitrator also noted that those directors could be "removed or . . . replaced in accordance with the Shareholders Agreement and the Bylaws of DMS," Final Award ¶ 4, as could the officers, id. ¶ 5.  Ultimately, the arbitrator did only what he promised the parties he would do:  "provide a set of rulings . . . [that] determine as a snapshot in time [that] this is the corporate governance of Data Mountain Solutions as we finish" the arbitration proceedings.  Arb. Trans. at 19.

### C.  Resolution of the Fee-Splitting Dispute

"[A]rbitration is predicated on the consent of the parties to a dispute."  Wolff v. Westwood Management, LLC, 558 F.3d 517, 520 (D.C. Cir. 2009) (citation and internal quotation marks omitted).  That consent may be reflected in "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract," or "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract."  9 U.S.C. § 2.  Consent may also be inferred where a party has engaged in arbitration of an issue "without objecting to the arbitrator's jurisdiction."  Howard Univ. v. Metro. Campus Police Officer's Union, 512 F.3d 716, 720 (D.C. Cir. 2008).  If a party has not consented to arbitration of a given issue, then an arbitrator "exceed[s] [his] powers" by reaching that issue, and any consequent award may be vacated by a court upon judicial review.  9 U.S.C. § 10(a)(4).

Mr. Giordano argues that he never consented to the arbitration of the issues addressed in Paragraph 9 of the Final Award, in which the arbitrator finds that Mr. Giordano, Mr.

McUmber, and DMS agreed to split the proceeds of the GSA-NTI contract among themselves according to certain fixed percentages.  MTV at 6.  In the view of Mr. Giordano, the arbitration clause of the Shareholders Agreement does not encompass any claims regarding "the existence of a compensation agreement among Giordano, McUmber, and DMS."  Id. at 15.  Mr. Giordano alleges that he did not consent affirmatively, either before this Court or before the arbitrator, to the arbitration of the fee-splitting issue, and that he promptly informed the arbitrator that he objected to any attempt to arbitrate the issue.  Id. at 19.[4]

For their part, the petitioners have not argued that the dispute over the division of contract fees was a matter falling within the reach of the Shareholders Agreement's arbitration clause.  Instead, they contend that Mr. Giordano is barred by the doctrine of judicial estoppel from claiming now that the fee-splitting issue is not arbitrable.[5]  The Court addresses that contention below, and then proceeds to consider whether Mr. Giordano implicitly consented to the arbitration of the fees dispute by failing to make a timely objection to the arbitrator's consideration of that issue during the arbitration process.

---

[4]     Mr. Giordano's counsel also suggested at oral argument that the arbitrator exceeded his authority in deciding the issues addressed by Paragraph 9 of the Final Award because the arbitrator had no jurisdiction over NTI.  This argument merits little attention.  Mr. Giordano has not identified any ruling of the arbitrator that binds NTI and therefore has failed to show that the arbitrator would have needed jurisdiction over that company.

[5]     The petitioners also assert that Mr. Giordano's argument is foreclosed by the principles of issue preclusion, res judicata, and law of the case.  Because the Court finds judicial estoppel the most appropriate doctrine to apply to Mr. Giordano's arguments, it does not address the other theories of preclusion advanced by the petitioners.

1.  Judicial Estoppel

Judicial estoppel is an equitable doctrine that prevents parties from abusing the

legal system by taking a position in one legal proceeding that is inconsistent with a position taken

in an earlier proceeding.  See New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001); Elemary v.

Holzmann A.G., 533 F. Supp. 2d 116, 125 n.6 (D.D.C. 2008).  The doctrine "protect[s] the

integrity of the judicial process . . . by prohibiting parties from deliberately changing positions

according to the exigencies of the moment."  New Hampshire v. Maine, 532 U.S. at 749-50; see

also Konstantinidis v. Chen, 626 F.2d 933, 938 (D.C. Cir. 1980) (purpose of the doctrine is to

prevent "improper use of judicial machinery"); Scarano v. Central Rail Co. of New Jersey, 203

F.2d 510, 513 (3d Cir. 1953) (observing that the application of judicial estoppel prevents the use

of "intentional self-contradiction . . . as a means of obtaining an unfair advantage").  As the

Supreme Court recently explained, "'[t]he circumstances under which judicial estoppel may

appropriately be invoked are probably not reducible to any general formulation of principle."

New Hampshire v. Maine, 532 U.S. at 750 (quoting Allen v. Zurich Insurance Co., 667 F.2d

1162, 1166 (4th Cir. 1982)).  The Court observed, however, that courts generally consider three

factors when determining whether to apply the doctrine of judicial estoppel in a particular case:

> First, a party's later position must be "clearly inconsistent" with its
> earlier position. . . .  Second, courts regularly inquire whether the
> party has succeeded in persuading a court to accept that party's
> earlier position, so that judicial acceptance of an inconsistent
> position in a later proceeding would create "the perception that
> either the first or the second court was misled," [Edwards v. Aetna
> Life Insurance Co., 690 F.2d 595, 599 (6th Cir. 1982)]. . . .  A third
> consideration is whether the party seeking to assert an inconsistent
> position would derive an unfair advantage or impose an unfair
> detriment on the opposing party if not estopped.

25

New Hampshire v. Maine, 532 U.S. at 750-51.  These factors, the Court emphasized, are not

"inflexible prerequisites or an exhaustive formula for determining the applicability of judicial

estoppel."  Id. at 751.  Rather, they serve as guideposts and "[a]dditional considerations may

inform the doctrine's application in specific factual contexts."  Id.

       When the petitioners first brought suit against Mr. Giordano in this Court in 2006,

he moved for the dismissal of their complaint, or for an indefinite stay of the litigation, on the

ground that "every single count of the 45-page Complaint relate[d] to the Shareholder's [sic]

Agreement" and therefore fell within the scope of the Agreement's arbitration clause.  2006 MTD

at 8.  Mr. Giordano invoked his right to arbitrate under the express terms of Paragraph 10 of the

Shareholders Agreement, and pointed out that as a result of the Agreement, "the plaintiffs must

arbitrate their claims."  Id.  The plaintiffs resisted Mr. Giordano's position, protesting that several

matters raised by the complaint were not subject to the arbitration clause.  2006 MTD Opp. at 14.

They insisted in particular that the alleged "conversion of the NTI contract and its proceeds is not

a dispute under the Shareholders Agreement."  Id.  In response, Mr. Giordano dismissed the

plaintiffs' arguments as "risible," stating: "The Shareholders' Agreement or the shares of

ownership are referred to on virtually every page of the 45-page Complaint.  Every single count of

the Complaint refers to the Shareholders' Agreement, either directly or by incorporation of

previous allegations."  2006 MTD Reply at 9 (citation omitted).  The Court was persuaded by Mr.

Giordano's arguments and ordered the case stayed pending the arbitration of all of the plaintiffs'

claims.  Data Mountain Solutions, Inc. v. Giordano, Civil Action No. 06-1666, Memorandum

Opinion and Order, at 5 (D.D.C. Nov. 21, 2006); 2007 Trans. at 5 (emphasizing that *all* of the

plaintiffs' claims were to be arbitrated).

Mr. Giordano, through his counsel, thus represented to the Court in his motion to stay that all matters in the complaint were arbitrable, and he reaffirmed that position in his reply brief. He got what he asked for: a stay of the plaintiffs' court case and the arbitration of all claims against him. If Mr. Giordano now were to argue, in the wake of an unfavorable result from the arbitration, that any issue raised in that complaint is not arbitrable, he would be blatantly reversing his prior position. Perhaps recognizing that reality, Mr. Giordano still maintains that "all counts in Plaintiffs' lengthy Complaint related to the Shareholders Agreement" and were thus encompassed by the Agreement's arbitration clause. MTV Reply at 3. He simply denies that "the Arbitrator's 'findings' in [P]aragraph 9 of the [Final] Award . . . have any truly discernible basis in the Complaint's allegations." MTV Reply at 3. *That* argument is risible.[6]

The plaintiffs asserted in their original complaint in this Court that "Giordano has intercepted, and now holds, substantial payments from DMS's client, NTI, that are intended for, and payable to, plaintiffs DMS and McUmber." Orig. Compl. ¶ 21. Each claim concerning the distribution of fees reiterated the same set of factual allegations: "As a result of the actions . . . of the Defendants, the Plaintiffs have suffered and will continue to suffer damages . . . of

---

[6]     Apparently believing that turnabout is fair play, Mr. Giordano has answered petitioners' judicial estoppel argument with a claim that the *petitioners* should be estopped from asserting that the fee-splitting dispute is arbitrable, because they filed counterclaims regarding the fees dispute in an interpleader lawsuit initiated by NTI in circuit court for Fairfax County, Virginia, in 2007. See Petition Opp. Supp. at 1. So far as the Court understands this argument, Mr. Giordano contends that by filing those counterclaims in the parallel NTI litigation after this Court ordered the parties to arbitrate all of their claims, the petitioners were indicating that they did not believe the fee-splitting dispute to be one of the claims ordered to arbitration. See id. at 2. This is nonsense. Even if the Court assumes that the petitioners were indicating such a belief, Mr. Giordano has introduced no evidence suggesting that the circuit court relied upon that position, or that the petitioners will receive an unfair benefit or inflict an unjust detriment as a result.

approximately $95,000 in payments actually made to the plaintiffs for their work on the NTI

contract but which payments were wrongfully intercepted and are being detained and otherwise

converted by the Defendants . . . ; [and] damages of $410,000 in further contract proceeds due and

payable to the Plaintiffs under the NTI contract but that are instead being wrongly claimed,

diverted, and converted by the Defendants." Id. ¶ 44; see also id. ¶¶ 74, 81, 86, 88, 97.

Despite the fact that those allegations clearly refer to a dispute over the entitlement

of Mr. Giordano, Mr. McUmber, and DMS to fees from the GSA-NTI contract, Mr. Giordano

insists that no allegations in the complaint "properly raise[d] the existence of [the] 'GSA-NTI Fee

Splitting Contract[]' upon which the Arbitrator based [P]aragraph 9 of the . . . Final Award."

MTV Supp. at 2.  While acknowledging that "McUmber alleged in the Complaint that Giordano

received money from the NTI Contract that did not belong to him," MTV Supp. at 2, Mr.

Giordano asserts that the complaint did not allege the existence of the fee-splitting agreement

found by the arbitrator in Paragraph 9, but instead was

> about Defendants Giordano and Watson violating the proportional
> ownership structure of the Shareholders Agreement in an
> underhanded and manipulative manner and then, as a consequence,
> directing to their own benefit the remuneration DMS received from
> the dotGOV contract, all to the detriment of the other DMS
> shareholders and officers.  Even the most generous reading of the
> Complaint is that Defendants Giordano and Watson used an
> improperly gained majority shareholder status to redirect the
> compensation due to DMS . . . under the Teaming Agreement in a
> manner benefit[t]ing them, to the detriment of Plaintiffs McUmber
> and Hill.  Paragraph 9 of the Award, as modified, went even
> beyond that.

MTV Reply at 3 (emphasis in original).

28

Mr. Giordano's interpretation of the complaint is, at best, creative.  The complaint does not mention the Teaming Agreement, nor does it claim that the remuneration "redirected" by Mr. Giordano was due only to DMS; rather, it indicates that payments from NTI were due to *both* DMS *and* Mr. McUmber.  See Orig. Compl. ¶ 21 ("Giordano has intercepted . . . substantial payments from DMS's client, NTI, that are intended for, and payable to, plaintiffs DMS and McUmber.").  More importantly, Mr. Giordano seems to have some rather odd ideas about the specificity with which the plaintiffs were required to plead their claims.  To assess the arbitrability of the plaintiffs' claims, one must determine whether the subject matter of those claims "aris[es] out of or relat[es] to" the Shareholders Agreement.  Shareholders Agreement ¶ 10(a); see, e.g., Wolff v. Westwood Management, LLC, 503 F. Supp. 2d 274, 289 (D.D.C. 2007) (to determine whether a claim is arbitrable, court asks whether the claim is "encompass[ed]" by the arbitration agreement), *aff'd*, 558 F.3d 517 (D.C. Cir. 2009).  The plaintiffs' complaint clearly alleged that DMS and Mr. McUmber were entitled to a certain portion of the fees paid out under the GSA-NTI contract, and that Mr. Giordano was wrongfully retaining those funds.  See Orig. Compl. ¶¶ 21, 44, 74, 81, 86, 88, 97.  It is true that the complaint refers to a certain dollar-amount of contract proceeds to which Mr. McUmber and DMS are entitled, while in the Final Award the amounts due to the plaintiffs are expressed as percentages of contract revenues.  But that difference is immaterial to the question of arbitrability.  In either case, the connection of the claim to the Shareholders Agreement is clear: Mr. Giordano attempted to gain control of DMS, violating the Shareholders Agreement in the process, so that he could take control of income from the GSA-NTI contract, including those funds payable to Mr. McUmber and DMS itself.  See, e.g., Orig.

Compl. ¶¶ 12, 21.  This is precisely the connection outlined above in the passage quoted from Mr. Giordano's brief.  See MTV Reply at 3.

The complaint therefore alleged the fee-splitting dispute with sufficient particularity to enable Mr. Giordano to determine whether the dispute was arbitrable.  And Mr. Giordano concluded that it was: "The arbitration clause at issue here is one of broad scope. Moreover, *every single count* of the 45-page Complaint relates to the Shareholder's Agreement." 2006 MTD at 8 (citation omitted; emphasis added).  Mr. Giordano cannot credibly assert that the fee-splitting dispute alleged in the complaint differs from that resolved by the arbitrator in any way that is relevant to the determination of arbitrability.  Thus, since the issues addressed in Paragraph 9 were presented in sufficient detail in the complaint to allow an accurate assessment of their arbitrability, Mr. Giordano's current claim that those issues were not within the jurisdiction of the arbitrator is a direct contradiction of his prior representations to this Court.

If the Court were to permit Mr. Giordano to espouse such obviously inconsistent arguments and then accepted his current position on the merits, Mr. Giordano would receive an undeserved advantage while inflicting an unfair burden on the petitioners.  The petitioners did not wish to have the fee-splitting dispute resolved in arbitration, see 2006 MTD Opp. at 14; they were forced to do so when Mr. Giordano insisted on his right to arbitrate all of their claims and persuaded the Court that all of those claims were arbitrable.  The parties then proceeded to spend more than a year in an arbitration process that included seven days of hearings and the presentation of more than 200 evidentiary exhibits.  If Mr. Giordano were now to succeed in arguing that the arbitrator had no jurisdiction over the fees dispute, all of the time and resources that the petitioners spent proving their case in arbitration — while their case in federal court was

on hold and ultimately dismissed — would have been wasted.  At the same time, Mr. Giordano

would gain an opportunity to escape an unfavorable judgment.  Such crass manipulation of the

legal process constitutes an insult to the integrity of the judicial system and fully warrants

invocation of the doctrine of judicial estoppel.  See, e.g., Cannon-Stokes v. Potter, 453 F.3d 446,

448 (7th Cir. 2006) ("Judicial estoppel is designed to prevent the perversion of the judicial

process").  Because Mr. Giordano has (1) adopted two plainly different positions before this

Court, (2) induced the Court to adopt the earlier of those positions, and (3) reversed his position in

order to benefit himself and disadvantage his opponents unfairly, he is estopped from objecting to

the arbitrator's exercise of jurisdiction over the dispute resolved by Paragraph 9 of the Final

Award.

### 2.  Consent to Arbitration

Even if Mr. Giordano were not judicially estopped from challenging the

arbitrability of the fee-splitting dispute, he would be barred from presenting that challenge before

this Court because he failed to present it during the arbitration.  "Absent excusable ignorance of a

predicate fact, a party that does not object to the arbitrator's jurisdiction during the arbitration may

not later do so in court."  Howard Univ. v. Metro. Campus Police Officer's Union, 512 F.3d 716,

720 (D.C. Cir. 2008).  This rule serves two purposes.  "First, arbitration is a matter of consent; if a

party submits to arbitration without objecting to the arbitrator's jurisdiction, then it may fairly be

said to have consented to the arbitration, and the other party, having gone foward with the

proceeding, may fairly be said to have relied upon that consent."  Id.  "Second, requiring a party to

object to the arbitrator's jurisdiction during the arbitration conserves resources," because if the

arbitrator "sustains the objection, . . . the parties can go directly to court and, if the court affirms, avoid an unnecessary arbitration proceeding." Id. at 721.

To preserve an objection to an arbitrator's jurisdiction, a party must raise it "clearly and explicitly" during the arbitration process. Environmental Barrier Co., LLC v. Slurry Systems, Inc., 540 F.3d 590, 606 (7th Cir. 2008); see also Opals on Ice Lingerie v. Bodylines, Inc., 320 F.3d 362, 368 (2nd Cir. 2003). The requirement that the objection be clear and explicit ensures that the objecting party's opponent has an opportunity "to respond with a petition for an order to compel arbitration under the [FAA]" and thereby "obtain a judicial determination on arbitrability." Environmental Barrier Co., LLC v. Slurry Systems, Inc., 540 F.3d at 606.

Mr. Giordano claims that he may now present to this Court his objections to the arbitration of the fee-splitting dispute because he "specifically and repeatedly" made those objections to the arbitrator. MTV at 19. The record does not support his claim. The petitioners raised the fee-splitting issue at the commencement of the arbitration process, claiming that Mr. Giordano had retained proceeds from the GSA-NTI contract that rightfully belonged to Mr. McUmber and DMS. See supra at 7. They expanded upon that claim in their pre-arbitration brief, arguing that Mr. McUmber was entitled to 23 percent of the proceeds and DMS to 49 percent. Cls.' Pre-Arb. Br. ¶¶ 4-5. In response, Mr. Giordano raised no questions regarding the arbitrability of those claims. Indeed, after the arbitrator contacted counsel for all parties and asked whether they would consent to his resolution of "issues that might require him to determine individual entitlements under contracts with third parties," MTV, Ex. 3, Mr. Giordano's counsel replied that his clients had "no objection" to the arbitration of the petitioners' claims, so long as

the arbitrator found that none of them had been waived.  MTV, Ex. 5 at 1.  That response entitled

both the petitioners and the arbitrator to rely upon the respondents' consent to arbitration of the

fee-splitting issue.

> In light of that consent to the arbitration of the fee-splitting issue, it is doubtful that

Mr. Giordano could have preserved an objection to the arbitrator's jurisdiction even if he had

explicitly made such an objection later in the arbitration proceedings.  The Court need not decide

that question, however, because Mr. Giordano never made such an objection.  As evidence that he

challenged the arbitrator's authority during the arbitration, Mr. Giordano points to several

statements made by his counsel on or after February 19, 2008 — more than three months *after* the

arbitrator asked if the parties would allow him to resolve issues related to the division of contract

proceeds, and well after the arbitrator had issued both the Partial Award and the Interim Order.

The following are the statements — each an excerpt from an email sent by Mr. Giordano's

counsel to the arbitrator and opposing counsel — which Mr. Giordano claims constitute his

objections to the arbitrability of the fee-splitting dispute:

> I have spoken to my clients, and they have confirmed that they do
> not believe claims to employees' compensation, or strategic
> decisions of the company, are suitable for arbitration, and do not
> wish them to be referred to an arbitrator.

MTV, Ex. 6 at 1.

> We continue to believe that awards of compensation, decisions
> regarding the hiring or firing of employees, decisions regarding the
> direction of the company, and other routine business dealings are
> the sole province of the directors and shareholders of Data
> Mountain Solutions, and the arbitration clause of the Shareholders'
> Agreement cannot be read to defer these business decisions to an
> arbitrator.

MTV, Ex. 7 at 1.

> We continue to maintain that awards of compensation, decisions
> regarding employees, decisions regarding the direction of the
> company, and other routine business dealings are the province of
> the directors and shareholders of Data Mountain Solutions, and
> cannot be read to be encompassed by the arbitration clause of the
> Shareholders' Agreement.

MTV, Ex. 8 at 1.  Mr. Giordano's counsel made similar comments during hearings before the

arbitrator.  See, e.g., Arb. Trans. at 11 ("strategic decisions" of the company should not be

subject to arbitration).

The problem with each of these statements is that none could reasonably be

expected to put either the arbitrator or the petitioners on notice that Mr. Giordano wished to

contest the arbitrability of the fee-splitting dispute.  Mr. Giordano attempts to get around this

problem by categorizing the fees dispute as one over "matters of compensation."  MTV at 19.

But in context, none of the objections regarding compensation quoted above can be read to

encompass the fee-splitting dispute.  First, an agreement regarding the initial split of GSA-NTI

contract proceeds among DMS itself and two of its principal shareholders cannot be considered

either a simple "award of compensation" or a "routine business dealing."  Second, further

statements of Mr. Giordano's counsel make clear that Mr. Giordano objected to the arbitration of

only *some* compensation matters, but not to all.  For example, a sentence after he proclaimed that

"claims to employees' compensation" were not "suitable for arbitration," Mr. Giordano's counsel

added that

> [t]o the extent . . . that Mr. McUmber and/or Mr. Hill have paid
> themselves funds without authorization from the Board of
> Directors or the shareholders, those unauthorized payments need to
> be returned to DMS.  But with regard to issues like the proper rate
> of payment for a contractor working in North Carolina, or whether
> Ms. Hunt is the appropriate person for a particular job, or what
> contracts DMS should pursue or decline, my clients view those

issues as well outside the scope of arbitrable issues.

MTV, Ex. 6 at 1.  These statements make clear that Mr. Giordano fully consented to — indeed, insisted upon, the arbitration of some "compensation" issues, such as disputes over any compensation paid by Mr. McUmber or Mr. Hill to himself.  The only compensation-related issue that Mr. Giordano specifically deemed not arbitrable — payment rates for contractors in North Carolina — is distinctly unrelated to the fee-splitting dispute.

Furthermore, the context in which Mr. Giordano's objections were made demonstrates that none of those objections were directed toward the disputes that led the arbitrator to include Paragraph 9 in the Final Award.  On December 5, 2007, petitioners' counsel, Mr. McNutt, sent to the arbitrator and the respondents an email in which he requested that the arbitrator find in future awards that (1) "DMS is entitled to the sum equal to 49% of the gross receipts from the dotGov contract," MTV, Ex. 5 at 1 ¶ 1; (2) "Derek McUmber is entitled to the sum equal to 23% of the gross receipts from the dotGov contract from and after June, 2006," id. at 2 ¶ 2; and (3) "[f]or all subsequent periods DMS and/or Giordano shall pay, or cause to be paid, to McUmber, an amount equal to 23% of the gross contract proceeds received by NTI under the dotGOV contract."  Id. at 2 ¶ 6.  Giordano's counsel objected to only one of those claims on the ground that it was "outside the scope of arbitrable issues": the last claim, to which counsel objected on the ground that "Mr. McUmber asks that he be permanently entitled to a fixed percentage of all future compensation from NTI; it is difficult to see how this future permanent compensation could be awarded or even sought."  MTV, Ex. 6 at 2.  Respondents thus gave no

indication that they believed the other claims regarding the apportionment of *past* proceeds from

the GSA-NTI contract to be unarbitrable.

Finally, Mr. Giordano's counsel first asserted that "awards of compensation" should not be made by the arbitrator approximately one month after the arbitrator clearly addressed compensation issues in his Interim Order. In that Order the arbitrator declared that Mr. McUmber should receive a monthly sum of $10,000 for his services, and that one "Susan Hunt" should be paid "at the rate of $87.60 hourly" for her work for DMS. Interim Order ¶ 2. Mr. Giordano's insistence that the arbitrator should not involve himself in matters related to compensation arose only after the issuance of these orders and thus would seem logically to apply to them, not to the fee-splitting dispute.

In light of all these considerations, Mr. Giordano has failed utterly to demonstrate that he made a "clear and explicit" objection to the presentation of the fee-splitting dispute to the arbitrator. He therefore consented to the arbitration of that issue and may not challenge the arbitrator's authority before this Court.

### III. REMEDIES

Having determined that Mr. Giordano has not demonstrated that any portion of the Final Award should be vacated or modified, the Court will grant the pending petition to confirm the award and deny the motion to vacate. One last set of issues remains to be addressed, however. In response to an Order of the Court instructing the parties to submit proposed orders that would resolve this case, the petitioners filed a proposed order that, far from merely confirming the Final Award, institutes a lien on Mr. Giodano's assets, creates a constructive trust on the GSA-NTI contract proceeds paid to Mr. Giordano, and appoints a trustee to collect and distribute those proceeds. See [Proposed] Order Confirming Arbitration Award at 1-2 (filed on

January 7, 2010).  The petitioners have cited, and the Court is aware of, no authority that would

permit the institution of such remedies based solely upon the confirmation of an arbitration

award that does not itself provide for the creation of a lien on assets or a constructive trust.  The

petitioners are entitled to move for any post-judgment relief allowable under the Federal Rules of

Civil Procedure or other applicable federal or District of Columbia law, but they must do so by

following the appropriate procedures, and not simply by requesting this Court to create a trust out

of thin air.

## IV.  CONCLUSION

For the foregoing reasons, the arbitral award issued on September 19, 2008, and

modified on November 14, 2008, is CONFIRMED in its entirety, and Mr. Giordano's motion to

vacate that award in part is DENIED.  Because a final judgment is being rendered in this matter,

the petitioners' motions for preliminary relief are DENIED as moot. An Order consistent with

this Opinion shall issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  January 15, 2010